No. 8209.

THE STATE OF LOUISIANA vs. JOSEPH GREGORY ET AL.

Sections 841, 842 and 843 of the Revised Statutes, providing for the punishment of the crime of arson, discussed and construed.

The indictment in this case is sufficient under said section 843, without negativing the exception mentioned in the statute.

Under the order of the Court below that "witnesses for the State and the accused were to be sequestered," the accused should not have been deprived of the testimony of some of his witnesses, who were not in court when the order was made and only presented themselves the day after.

A witness of the State, on the cross-examination, having been asked what his feelings were towards the accused and having answered that they were bad and unfriendly, Counsel for the State had no right, on the re-examination in chief, to ask the witness to state the reasons of his animosity.

A witness may be examined on the cross-examination as to matters not embraced in the direct examination, when it is only for the purpose of testing his credibility. State vs. Willingham, 33 An. 537, affirmed.

APPEAL from Fourth Judicial District Court, parish of Caldwell. *Bridger*, J.

47

*D. B. Gorham* and *John Ray* for the accused, Appellants.

*J. C. Egan,* Attorney General, for the State, Appellee:

First—Sec. 843 R. S. does not contain an exception or proviso.

Second—Provisos in statutes are not required to be set out in an indictment charged thereunder, unless the proviso or exception is a part of the definition of the crime. 25 Conn. 48; 24 Conn. 522.

Third—When an indictment conforms to the wording of the Statute under which it is drawn, it is valid.

Fourth—Jurymen are competent to serve although they may have formed opinions concerning the guilt or innocence of the accused, when those opinions would not weigh or influence their minds in arriving at a verdict in accordance with the evidence introduced on the trial. State vs. Charles Johnson et al., 33 An.

Fifth—Evidence to prove the motive which might have actuated the accused in the perpetration of the crime is admissible. State vs. John Crowley et al., 33 An.; 38 Mo. 496; *ib.* 587; 42 *ib.* 242.

Sixth—It is admissible for the State to prove the relationship which existed between the accused on trial.

Seventh—It is competent for the District Attorney, on the re-examination of the State's witness, to question him on matters brought out by defendant's counsel in the cross-examination.

Eighth—"The general rule, that leading questions are not allowed on the examination in chief, is subject to the discretion of the court, and the admission of evidence in answer to such questions, is not a ground for a new trial." Chitty's Crim. Law, p. 620, note; 9 Conn. 275, etc.

Ninth—When the accused disobeys the order of the court which forbids him to communicate with his witnesses, he cannot be heard to complain of the infliction of the penalty which the court imposes.

The opinion of the Court was delivered by

TODD, J. The defendants were indicted with having wilfully and maliciously set fire to and burned a certain steam gin and mill house of one Richard G. Sermon. They were tried, convicted and sentenced to seven years imprisonment in the penitentiary. From which sentence they have appealed.

The errors assigned, and on which they rely for a reversal of the sentence, are thus stated:

1. "That the indictment does not describe an offense under section 843, Revised Statutes, the same not negativing the exception and proviso in the enacting clause of the statute."

2. That the court erred in rejecting the witnesses, Mrs. and Miss Kent, offered by defendants.

3. The court erred in permitting Meredith, a State witness, to state the cause of his unfriendly feelings towards accused, Gregory.

4. The court erred in permitting the District Attorney to ask Blanks, a witness for the State, whether " the witness had borrowed his overcoat on that day," it being a leading question.

5. The court erred in permitting the witness Raines, on cross-

examination, to be examined on matters not raised in his examination in chief.

6. The court erred in admitting the testimony of Sermon, Gray, and Clay, called to prove conversations some days before the offense charged, not in reference to said offense.

7. The court erred in permitting the State to prove that the defendants were intimate personal friends as tending to prove the offense charged.

First. Section 843, under which the accused were indicted, provides:

"Every person who shall wilfully or maliciously set fire to or burn any outhouse, stable or barn, any shop, store, office, warehouse, sugar house, cotton-gin house, cotton press, cotton pickery, school-house, church, or any building of public worship, or any other building not embraced and provided for in the two preceding sections, or any vessel, ship or steamboat, or other water craft not embraced in the two preceding sections, shall, upon conviction, suffer imprisonment at hard labor for not less than seven years, nor more than twenty years."

The indictment is as follows:

"That Joseph Gregory and Walter Kent * * * a certain steam gin and mill house of one Richard G. Sermon, there situated, feloniously, wilfully and maliciously did set fire to, and the said steam gin and mill house then and there by such firing as aforesaid, feloniously, wilfully and maliciously did burn."

The alleged error consists, as argued by defendants' counsel, in the indictment not negativing that the steam gin and mill house were embraced and provided for in the two preceding sections; and that such negation was essential to constitute an offense in view of the words of the statute "*or any other building not embraced and provided for in the two preceding sections.*"

To understand it fully, it is necessary to refer to these two preceding sections. They are as follows:

"Sec. 841. Every person who shall wilfully or maliciously set fire to or burn, in the night time, any house, ship, vessel, steamboat or other water craft, in which there shall be, at the time, some human being usually staying, lodging or residing at night, upon conviction thereof, shall suffer death."

Section 842 differs from 841 only in the use of the words "in the daytime" instead of "the night time," and in the penalty prescribed, which is not less than ten years in the penitentiary.

It is clear to our minds that the law-maker in enacting these three statutes, or sections of a statute, intended to define and provide for three distinct offenses, or rather three grades of the one generic offense of arson.

The first, and most heinous, " the burning *in the night time* of a dwelling house or house wherein human beings usually stayed. The second, and less heinous, the burning in the *daytime*, of the same character of house or human dwelling, and the third and still lighter crime of burning, whether in the daytime or night time, an outhouse or other building not used as a dwelling. This seems to be the plain intent and purview of these three sections.

If the indictment had been framed under the first of these sections, it would have been essential that it should charge that the burning was *in the night time*, and that the house burned was occupied usually *at night as a lodging by a human being*, in the words of the statute. This being of the very essence of the offense, and the essential description thereof; so, if charged under the second, the averments that it was done *in the daytime*, and that the house burned *was one in which a human being usually stayed or resided*, in accord with the language of the section; such also being of the essence, and essential to the description.

Under the third, it is sufficient to charge the burning of an outhouse, stable, steam gin, and mill house, or of any other building of a kind not usually occupied as a dwelling or place of lodging, and such as are not mentioned in the preceding sections, and the offense is complete, and the description if it is not aided by reference to the preceding sections, but is entirely independent of anything contained therein; and the indictment need not, therefore, contain such reference. The section, in fact, contains no exception or proviso as recognized by law-writers on the subject, and the authorities referred to by the counsel for the accused are, therefore, inapplicable. The words "any other building or house not embraced and provided for in the two preceding sections," were used simply to authorize and justify an indictment for the burning of a building just such as is described in the present bill. An exception or proviso in a criminal statute generally means some benefit intended for the accused, and by pleading and establishing which he may be exculpated, and the negative of which proviso or exception is essential in some cases to show affirmatively that a real offense has been committed. Thus, as illustrated by Bishop, "where a statute provided that if any person shall on the Sabbath exercise any secular labor, business or employment, *except* such only as works of necessity and charity, he shall be punished," etc., a complaint not negativing the exception was held to be insufficient. And, again, " when a statute declared that no innholder shall entertain or suffer any of the inhabitants of the respective towns where they dwell or others *not being travelers, strangers or lodgers in such houses*, to abide or remain in their houses, etc., drinking, etc., on the Lord's day, etc., on penalty, etc., it was held to be necessary in the indictment to set forth that the persons entertained were neither travelers, strangers nor lodg-

ers." Bishop, Crim. Procedure, § 632-33-34-35-36. Had these acts, instead of containing the word " except," denounced the acts mentioned, and then followed with the word " provided " that in the one case it should not apply to works of charity, and in the other to those innkeepers entertaining travelers or lodgers, we would have an instance of a " proviso " as treated of by the authorities on the subject.

There is nothing of this kind, or in any way relating to it, in the statute or indictment under consideration. There was no benefit designed or intended by the words referred to in this statute, but, on the contrary, had the accused pleaded that the building charged to have been burned was really a dwelling-house in which human beings usually stayed, it would have been a plea, not of a benefit or of exculpation, but of a more aggravated offense. Even could the words referred to be construed as declaring an exception or proviso, the authorities are by no means uniform that such exception or proviso, even if found in the enacting clause, need be negatived, but is a matter of defense to be set up by the accused.

1 Chit. Crim. Law, 283, 284; 24 Conn. 522; 25 Conn. 48; 8 Johns. 41.

Upon this point, however, we express no opinion, since the question is not properly before us. The indictment was good and sufficient, and the motion in arrest of judgment, based on its alleged insufficiency on the grounds discussed, was properly overruled.

Second. On the trial of the cause, two witnesses, Mrs. Kent and Miss Kent, were offered in behalf of the accused, Kent, and they were rejected on objection made by the District Attorney. The following are the facts connected with the ruling of the judge a quo on this point, as disclosed by the record :

After the jury was empaneled, and before proceeding with the evi-. dence, the following order was entered on the minutes:

" Witnesses for the State and the accused were ordered to be sequestered."

When this order was made the witnesses named were not present. Counsel for the accused stated that these witnesses had been informed they would not be needed the first day, and it was understood that as soon as they came in they should be sequestered, and when they made their appearance on the following day they were accordingly sequestered with the other witnesses. These witnesses lived in the country, and it appears that after the adjournment of court, about midnight of the first day, one of the accused went to the house where these witnesses resided and remained there until the next morning. When these witnesses were introduced with a view to being sworn in behalf of Kent, their testimony was objected to by the District Attorney on the ground that Kent " had been to the house of the witnesses the night preceding,

and had violated the order of sequestration" (we quote from the bill of exceptions). Thereupon the witnesses were sworn on their *voir dire* and stated " they had had no conversation with the accused about the matter at issue, and that he only came there to inform them that they would be needed next day and to provide means of transporting them to court." The judge, as stated, refused to permit them to testify. He assigns, as an explanation of his ruling, that the order he gàve touching the sequestration of the witnesses, was made under an agreement of counsel on both sides, and that the sheriff was to take charge of them and continue in charge of them until the witnesses were sworn and discharged, and that neither the party against whom the offense was charged to have been committed, nor the accused, were to be allowed communication with them. The order quoted is not as comprehensive on the face of it as the judge states it to be. To determine what an order is' and its effect as to the parties designed to be affected by it, courts must be governed by the entry on the minutes. But, even giving full weight to the explanation of the judge, we think his ruling was wrong.

In the first place, the witnesses were not present in court when the order was made, and, therefore, did not become subject to it at the time; were not in fact *sequestered* till they appeared and placed themselves in charge of the sheriff next day. This order, sequestering witnesses, is directed mainly to the witnesses and intended to control their conduct and movements. It is intended to insure truthful statements, as far as possible, from the witnesses by preventing collusions and understandings between them, and depriving each of them of all opportunity of shaping his testimony to conform to what he may have testified to by another. Bishop thus speaks of and describes the nature and purpose of the order:

" In pursuance of this doctrine, it has always been deemed competent for the court to see that the witnesses in a criminal cause are examined, as much as possible, separate and apart. This is done by ordering, on motion of either party, the *exclusion of the witnesses, whether called on the one side or the other, from the court-room during the examinations,* until they shall, respectively, have given in their testimony."

To hold that the authority of the judge in this respect can be extended to reach witnesses who were never informed of his order and debar a party accused from all communication with his *witnesses, might* well lead to the rankest injustice and oppression. We cannot sanction such a doctrine; and, without deciding to what extent an accused may be permitted to confer with his witnesses whilst they are actually under sequestration, and how far circumstances may enlarge or justify his discretion in the matter, we have no hesitation in saying that, under the facts of this case, when these witnesses made the statements on their

oaths that they had held no communication with the accused on the sub-
ject of the trial, they should have been permitted to testify; and by
reason of the defendant, Kent, being thus deprived of testimony which
was legally admissible, and testimony which the record shows was cal-
culated to have an important bearing on the result of the trial, is of itself,
sufficient to entitle him to have the judgment set aside and the cause
remanded, so far as relates to himself.

Third. One Meredith was called and examined as a witness for the
State, and on his cross-examination the following took place (we quote
from the bill of exceptions): he was asked:

" What was the state of his feelings towards the accused, Jos.
Gregory, and whether he was friendly to him; and the said witness hav-
ing answered that the state of feeling to him was bad, and that they
were not friendly, the counsel for the State, on re-examination of his
said witness, offered to show the cause of the ill feeling of the said wit-
ness to the accused; which was objected to by defendant's counsel, for
the reason that the cause of the difficulty was not inquired into by the
defendants on their cross-examination; that it was not, therefore, in re-
buttal, formed no part of the *res gestæ*, would tend to prejudice the jury,
and was an indirect attack on the character of said Gregory, which was
not in issue, and that the counsel for the State must be confined in his
examination to the matter brought out by defendants' cross-examina-
tion."

This objection was overruled and the witness permitted to give the
reasons for his unfriendliness to the accused.

The counsel for the accused had a clear right to question the wit-
ness touching his feelings to the accused with a view to determining
the credibility of the witness.

The sole object of it was to prove the fact or existence of the un-
friendly feeling, and beyond this, neither the question nor the answer could
legitimately have any bearing whatever on the question presented. If
the witness did entertain such feeling, his credibility, under the law, was
affected thereby, and it was a matter to be duly considered by the jury
in weighing his testimony. If he entertained no such feeling, his credi-
bility was unimpaired; and the inquiry should have ceased and the mat-
ter closed here, the end and object of the inquiry being fully accom-
plished. When, however, the witness was permitted in his re-direct-
examination to detail the cause or causes of his animosity, he not only was
suffered to testify as to matters that were wholly irrelevant to the main
issue on trial—the guilt or innocence of the accused—but an opportunity
was afforded him to poison the mind of the jury against the accused by
relating facts and circumstances, and making accusations wholly dis-
connected with the charge for which he was on trial, without an op-

portunity of defense or reply being offered to the accused, and thus insensibly lead the minds of the jury from the real issues before them to the contemplation of the guilt of the party in other matters for which he was not on trial. We cannot tell what effect such illegal testimony might have had in this case; but the proceeding is so irregular and opens the door to such abuses as compels us to remand the case. If such a practice were sanctioned it would place an accused to a great extent at the mercy of an unscrupulous and vindictive witness, and open the way to an *ex parte* trial against him on charges for which he was afforded no hearing.

Reaching this conclusion, it might not seem altogether necessary to pass on the other points of error assigned, but in view of another trial, and to meet the qustions that may arise again, we think it sufficient to say that we have duly considered each one of them *seriatim*, and have come to the conclusion that there is no force in them.

The rulings, under the facts presented, were correct. In regard to the question raised in the fifth point or assignment, touching the right on a cross-examination to examine as to matters not embraced in the direct examination, where such new matter is introduced to test or affect the credibility of a witness, we had the same subject before us in the case of State vs. Willingham, lately decided and not yet reported, and our reasoning in this point we refer to and re-adopt in the instant case.

It is, therefore, ordered, adjudged and decreed that the sentence and judgment appealed from be annulled, avoided and reversed, and the case remanded to be tried according to law and the views herein expressed.